WINSOR, J.
Florida is the Sunshine State. It has long had the “Government in the Sunshine Law,” which generally requires open meetings for boards, commissions, state agencies, and the like. See § 286.011, Fla. Stat. (2017)[1]; see also Art. I, § 23, Fla. Const. The statute, which the Legislature “enacted in the public interest to protect the public from ‘closed door’ politics,” Wood v. Marston, 442 So.2d 934, 938 (Fla. 1983), is serious business: not only is there criminal liability for officials who knowingly disregard it, e.g., § 286.011(3)(b), Fla. Stat. (2017), but also Florida law provides that “where officials have violated section 286.011, the official action is void ab initio,” Sarasota Citizens For Responsible Gov’t v. City of Sarasota, 48 So.3d 755, 762 (Fla. 2010).
But while sunshine may be “the best of disinfectants,” Buckley v. Valeo, 424 U.S. 1, 67 n.80, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) (quoting L. Brandéis, Other People’s Money 62 (National Home Library Foundation ed. 1933)), sometimes the public is better served without real-time meeting access. Accordingly, the Legislature has enacted limited exceptions to the open-meeting requirements. This case requires us to consider the reach of one of those statutory exceptions—an exception that applies in the contract procurement context and exempts “[a]ny portion of a team meeting at which negotiation strategies are discussed.”
I.
The Florida Department of Revenue maintains a child-support program that processes and disburses child-support payments. According to the Department’s website, it annually processes payments of more than a billion dollars on behalf of almost a million children. About the Child Support Program, http://floridarevenue. com/dor/childsupporVabout_us.html (last visited Sept. 28, 2017). The Department relies on outside vendors to support this system, and vendor contracts can involve significant state dollars. (The contract at issue below involved tens of millions of dollars.) Not surprisingly, therefore, the Department’s vendor-selection process can face great scrutiny.
Xerox State and Local Solutions, Inc., (Xerox, for short), operated the program for years. When the contract came up for renewal in 2013, Xerox hoped to keep it. To do so, Xerox had to beat out Systems and Methods, Inc., (SMI), the only other company to respond to the Department’s invitation to negotiate (ITN). Ultimately, the Department selected SMI—a decision that led to litigation and this appeal.
After losing out on the contract, Xerox challenged the procurement decision by filing a chapter 120 administrative action. That action was ultimately unsuccessful; this court affirmed the Department’s final order awarding the contract to SMI. Xerox State & Local Sol., Inc. v. Dep’t of Revenue, 187 So.3d 386 (Fla. 1st DCA 2016) (per curiam).
In a separate action, a Xerox manager— appellant Richard Carlson—sued the De *1265 partment, contending that the procurement process violated Florida’s Sunshine Law. Carlson alleged that the Department had violated both chapter 286, Florida Statutes, and article I, section 24 of the Florida Constitution. He sought a declaration that the contract award was void, an injunction prohibiting the Department from continuing with the contract, and attorney’s fees. SMI intervened as an additional defendant, and the parties filed competing summary judgment motions after a lengthy discovery period. After a hearing, the trial court entered summary judgment against Carlson, who brought this appeal.
II.
To understand Carlson’s claims, we must first understand a bit more about the procurement process at issue. The Department issued the ITN in 2013, seeking qualified contractors to provide specific services. The Department also appointed an Evaluation Team and a Negotiation Team to participate in the selection process. The Evaluation Team’s job was to evaluate the proposals and share their evaluations with the Negotiation Team. The Negotiation Team’s job was to conduct negotiations with the bidders and ultimately decide the winner. All parties agree that the Negotiation Team had the authority to ultimately decide which vendor won.
The Evaluation Team never met. Its members independently reviewed the proposals and passed along their independent evaluations. The Negotiation Team, by contrast, met some twenty-two times. Some meetings included interaction with representatives from SMI and Xerox, and some did not. At one meeting, the Negotiation Team decided to proceed with only SMI and to solicit SMI’s best and final offer. At the Team’s final meeting—the May 16 meeting—the Negotiation Team discussed the proposal and finalized and memorialized its decision to declare SMI the winner.
III.
Carlson presents several challenges to the trial court’s summary judgment order, an order we review de novo, Major League Baseball v. Morsani, 790 So.2d 1071, 1074 (Fla. 2001).
A.
We begin with Carlson’s arguments about the Evaluation Team. Carlson does not complain that the Evaluation Team met outside of the sunshine; his complaint is that the team didn’t meet at all. Rather than operating as components of a collegial body, each Evaluation Team member individually evaluated' the competitors’ proposals, individually assigned scores, and individually submitted their scores for consideration by others. The team never met, never collaborated, and never discussed the competing proposals.
Carlson contends that the Evaluation Team was responsible for “crystallizing” the ultimate procurement decision, so it was obligated to meet—and to meet in public. Cf. Tolar v. Sch. Bd. of Liberty Cty., 363 So.2d 144, 145 (Fla. 1st DCA 1978) (“One purpose of the government in the sunshine law was to prevent at nonpublic meetings the crystallization of secret decisions to a point just short of ceremonial acceptance/’), aff'd, 398 So.2d 427 (Fla. 1981). Carlson relies primarily on Silver Express Company v. District Board of Lower Tribunal Trustees of Miami-Dade Community College, which explained that “advisory committees which have offered up structured recommendations ... at least those recommendations which eliminate opportunities for alternative choices by the final authority, or which rank applications for the final authority [ ] have been determined to be agencies gov *1266 erned by the Sunshine Law,” 691 So.2d 1099, 1101 (Fla. 3d DCA 1997). But the Evaluation Team (or more accurately, its individual members) neither ranked the competitors, nor excluded any from consideration of the ultimate decider, the Negotiation Team. Cf. Knox v. Dist. Sch. Bd. of Brevard, 821 So.2d 811, 314 (Fla. 5th DCA 2002) (distinguishing Silver Express and noting that “[although the team made recommendations, all the applications went to the superintendent and he decided which applicants to interview and nominate”). Therefore, even if Silver Express bound us, it would not help Carlson,.
Nor does Leach-Wells v. City of Bra-denton—the second, case Carlson cites on this point—help. 734 So.2d 1168 (Fla. 2d DCA 1999). In Leach-Wells, the court held that if a committee’s task “was ‘formal action,’ _ a meeting was required.” Id. at 1171. It went on to conclude that “if a meeting was required and none was held, a Sunshine Law violation occurred.” Id. But here, the Evaluation Team (or more accurately, its individual members) took no formal action. Cf. § 286.011(1), Fla. Stat. (2017) (providing that “no resolution, rule, or‘formal action” is valid “except as taken or made at [a required public] meeting”). The Evaluation Team had no obligation to conduct a meeting.
We -therefore, conclude that the trial court correctly granted summary judgment as to Carlson’s Evaluation-Team claims. Carlson’s Negotiation-Team claims present more difficult questions, and we turn to those next.
B.
Section 286.0113 exempts from public meeting requirements “[a]ny portion of a team meeting at which negotiation strategies are discussed.” § 286.0113(2)(b)(2), Fla. Stat. But the exempted meetings do not forever remain out of public view: “A complete recording shall be made of any portion of an exempt meeting," id. § 286.0113(2)(c)(l), and the recordings become publicly available at “such time as the agency provides notice of an intended decision or [ ] 30 days after opening the bids, proposals, or final replies, whichever occurs earlier,” id. § 286.0113(2)(c)(2).[2] -
Because the parties agree that the Negotiation Team is subject to the Sunshine Law generally, we need only consider whether certain meetings of the Negotiation Team fit into this “negotiation strategies” exception. To decide that, we must figure out the exception’s reach.
1.
The basic point of the statutory exception is obvious enough: the Legislature sought to ensure that state actors responsible for negotiating contracts didn’t have their negotiation plans made public until the negotiations were through. Indeed, in the public justification,[3] the Legislature explained that “[t]eam members often meet to strategize about competitive solicitations and the approach to take as part of the evaluation process. Without the public meeting exemption .,, the effective and efficient administration of the competitive solicitation process would be hindered.” Oh. 2011-140, § 3, Laws of Fla. But while *1267 the exception’s rationale may be obvious, the point at which any meeting enters or exits the “portion ... at which negotiation strategies are discussed” is not. That is part of what makes this a difficult case.
The Department—and to a lesser extent SMI—argue that the statute covers the entirety of any meeting at which “negotiation strategies are discussed.” They contend that “any portion” means “every portion”—and that the Legislature therefore enacted a broad exemption reaching even meeting “portions” having nothing to do with procurements. According to this argument, the phrase “at which negotiation strategies are discussed” modifies “meeting,” not “portion.”
There is much to like about this proposed interpretation, not the least of which is that it would avoid any need to decide what “portions” of any particular meeting were covered. And to be sure, this interpretation enjoys some textual support. For one thing, other parts of the subsection refer to the “exempt meeting”—not “the exempt portions of the meeting,” see, e.g., § 286.0113(2)(c)(2), Fla. Stat. (noting recording of “the exempt meeting” is exempt from chapter 119); id. § 286.0113(2)(e)(1) (“No portion of the exempt meeting may be held off the record.”).[4] Plus, the Legislature used a seemingly more restrictive phrase in another part of the same statutory section, exempting “[í ]⅛<¾⅜ portion of a meeting” that would betray information about security systems. Id. § 286.0113(1) (emphasis added). We typically view the Legislature’s use of varied language in the same statute as a sign the Legislature intended varied things. See DPRB v. Durrani, 455 So.2d 515, 518 (Fla. 1st DCA 1984) (“The legislative use of different terms in different portions of the same statute is strong evidence that different meanings were intended.”); see also A. Scalia & B, Garner, Reading Law: The Interpretation of Legal Texts 170 (2012) (“[Wjhere the document has used one term in one place, and a materially different term in another, the presumption is that the different term denotes a different idea”). This rule of interpretation is far from absolute, though, .primarily because it “assumes a perfection of drafting that, as an empirical matter, is not often achieved.” A. Scalia & B¡ Garner at 170. For whatever reasons, “drafters more than rarely use the same word to denote different concepts, and often ,.. use different words to denote the same concept.” Id. Nonetheless, we cannot ignore the fact that in the same statutory section, the Legislature chose two separate phrases: “[t]hat portion of a meeting that would reveal ...” and “[a]ny portion of a meeting at which .... ” § 286.0113(1), (2)(b),
But despite colorable arguments supporting the Department’s interpretation, we conclude that the statute’s “any portion” language limits the exemption to portions of meetings—the portions “at which negotiation . strategies are discussed.” Other portions—those in which negotiation strategies are not discussed— are not exempt. We reach this conclusion for three main reasons. First, interpreting the exception to cover entire meetings, when only portions included negotiation-strategy discussions, would render the phrase “any portion” meaningless. We try to avoid statutory interpretations that render meaningless any words the Legislature chose. See Fla. Police Benevolent Ass’n v. DACS, 574 So.2d 120, 122 (Fla. 1991).[5]
*1268 Next, interpreting the exception to cover entire meetings would raise potential constitutional issues. See State v. Giorgetti, 868 So.2d 512, 518 (Fla. 2004) (noting “canons of statutory construction requiring us to interpret the statutes in a way as to avoid any potential constitutional quandaries”). The Legislature’s authority to exempt meetings is limited; any exemption “shall be no broader than necessary to accomplish the stated purpose of the law.” Art. I, § 24(c), Fla. Const. By interpreting the statute as we do, we avoid the potential constitutional quandary of whether the Legislature’s stated justification for the exemption would justify exempting entire meetings when only a small portion of the meeting requires secrecy.
Finally, and perhaps most importantly, our interpretation follows the most natural reading of the statute. Although generally “any” means “all,” see, e.g., United States v. Gonzales, 520 U.S. 1, 5, 117 S.Ct. 1032, 137 L.Ed.2d 132 (1997), that does not mean “any portion of a meeting at which negotiation strategies are discussed” means “the entirety of any meeting at which negotiation strategies are discussed.” This is because the phrase “at which negotiation strategies are discussed” limits the word “portion”—not the word “meeting.” In other words, the statute does exempt any (and indeed all) meeting “portions” that include negotiation-strategy discussions. But it does not exempt all portions of any meeting, so long as that meeting included those discussions. This is the most natural and logical reading of the statute.
2.
Having decided that the statute exempts only portions of meetings, we must now consider Carlson’s claim that the Negotiation Team unlawfully closed nonexempt portions. On this point, we consider only four of the twenty-two meetings because Carlson did not seek relief as to the other eighteen.
The first meeting at issue was in January of 2014. In that meeting, the Negotiation Team selected Xerox and SMI to participate in the negotiations phase. Although Carlson contends there were unresolved facts regarding this meeting, we see none that would preclude the trial court’s entry of summary judgment. There was evidence that the Negotiation Team met to evaluate bids and determine which (if any) bidders the team would negotiate with. Negotiation strategies encompass the decisions on which bidders will participate in negotiations, so the portions of the meeting in which the Negotiation Team considered those issues were exempt. Carlson did not produce any evidence to create a genuine question of material fact about whether the meeting also included a discrete portion not including discussion of negotiation strategies.
In the second pertinent meeting, held in February 2014, Evaluation Team members and the Negotiation Team discussed Xerox’s and SMI’s earlier demonstrations. They discussed, among other things, what additional information they would seek from the bidders. These activities are also encompassed within the negotiation-strategies exemption, and Carlson *1269 did not submit evidence that could defeat summary judgment on this point.
The third pertinent meeting was in April 2014. In that one, the Negotiation Team decided to pursue negotiations with SMI and not with Xerox. The team also decided to seek a “Best and Final Offer” from SMI. Both of these constituted strategic negotiation decisions, and the statutory exemption covers discussions about those decisions. Again, the summary judgment record does not demonstrate a disputed issue of material fact, and again the trial court was correct to grant summary judgment as to this meeting.
The fourth and final meeting at issue was on May 16, 2014. At that meeting, the Negotiation Team deliberated about whether SMI should win the contract award. At some point during that private meeting, the Negotiation Team decided that SMI should win, and the team members formalized their decision—still in private session—by signing an award memorandum. After that meeting, the Department announced that SMI had prevailed and that Xerox had not.
Unlike with the other three meetings, the parties agree that there are no disputed issues of material fact as to the May 16 meeting. Carlson therefore presents a purely legal question. He contends that because the Negotiation Team selected SMI, it necessarily took action's beyond “negotiation strategies.” In other words, Carlson argues, voting to select SMI cannot be a “negotiation strategy.” But the question is not whether a vote constitutes a “negotiation strategy”; the question is whether, as a matter of law, a vote cannot be within that “portion of a team meeting at which negotiation strategies are discussed,” § 286.0113(2)(b)(2), Fla. Stat.
If the Negbtiation Committee’s vote necessarily constituted its own “portion” of the May 16 meeting, we would reverse. A “portion” is some part that is less than the whole, and the vote itself constituted less than the whole meeting. Indeed, in some sense, every spoken word at every meeting could constitute its own portion. But we cannot read “portion,” as used in the statute, so narrowly. Instead, the exempted “portion” includes not only the negotiation-strategies discussions themselves, but also meeting activities inextricably intertwined with those discussions.
The May '16 meeting included negotiation-strategies discussions and the ultimate award' decision. These were intertwined activities without a clear dividing line between them. Until the last signature appeared on the memorandum, until the decision awarding the contract to SMI was formalized, the Negotiation Team had several options before it. It could have declared SMI was the winner (which it did); it could have sought additional concessions from SMI (a negotiation strategy); it could have reopened competing negotiations with Xerox (another negotiation strategy); or it could have pulled the plug on the whole thing, starting a new-process seeking a more favorable outcome (yet another negotiation strategy).
It is impossible to separate the discussions that culminated in the formal decision from the decision itself. At the same time the Negotiation Team was deciding to award to SMI, it was deciding not to pursue available competing options. Had it ultimately pursued one of those other options—and had it done so at a public meeting—-it would have' continued in the procurement process without'the protections the exemption provides. For example, had the Negotiation Team decided SMI’s final offer was inadequate and that the team should initiate negotiations with Xerox— and had it done so at a public meeting— both Xerox and SMI would have partid- *1270 pated m further negotiations knowing the Negotiation Team’s views of SMI’s proposal. Yet the exemption provides protections “until such time as the agency provides notice of an intended decision.” § 286.0113(2)(c)(2), Fla. Stat.; see also Oh. 2011-140, § 3, Laws of Fla. (noting public need for exemption to promote “effective and efficient administration of the competitive solicitation process”).
We cannot' conclude that the May 16 vote was discrete and separable from the discussions that surrounded it. We therefore cannot conclude that the vote was, as a matter of law, not within the “portion of [the] team meeting at which negotiation strategies are discussed.”
C.
.Last, we consider Carlson’s arguments about the failed audio recordings. As already noted, the statute required the Department to make a “complete recording” of exempt portions. § 286.0113(2)(c)(2), Fla. Stat. (2017). The Department made audio recordings of its meetings, and those recordings were “exempt until such time as the agency, provide[d] notice of an intended decision or until 30 days after opening the bids, proposals, or final replies, whichever occur[ed] earlier.” Id. § 286.0113(2)(c)(2). When Xerox requested copies, the Department discovered that some recordings were inaudible. Some inaudible recordings were electronically recovered, but the recordings of the April 29 and May 16 meet; ings were never fully recovered.
Carlson contends that the Department’s failure to provide audible recordings constitutes a Sunshine Law violation. The Department responds that no recordings were even necessary—that it complied with its obligation to make a. “complete recording” by preparing a meeting agenda and.taking “written notes, drafted at the time of. the meeting [that] accurately reflect discussions held at the meeting.” We reject the Department’s argument because a “complete recording” requires more than an agenda and meeting notes. A “complete recording” gives the public access to exactly what happened at the exempt portion; someone’s notes do not.
Here, the Department made an audio recording, but somewhere along the line suffered a technology faitee that precluded Xerox (and Carlson and anyone else seeking access) from learning exactly what happened. The failure affected only two of the twenty-two Negotiation Team meetings, and Carlson makes no allegations of bad faith or anything beyond the technological misfortune that sometimes accompanies modern life. Under these circumstances, we agree with the trial court that the Department’s technological inability to recover the two' meetings’ recordings do not constitute a statutory violation.
AFFIRMED.
WINOKUR and JAY, JJ., CONCUR.

. Courts commonly refer to Section 286.011, Florida Statutes, as the “Government in the Sunshine Law.” E.g., Sarasota Citizens For Responsible Gov’t v. City of Sarasota, 48 So.3d 755, 762 (Fla. 2010); Canney v. Bd. of Pub. Instruction of Alachua County, 278 So.2d 260, 262 (Fla. 1973).

. If the .agency rejects all bids and starts over, the recordings are exempt until the agency completes the subsequent process. Id. §' 286.0113(2)(c)(3). The exemption, though, will not last “longer than 12 months after the initial agency notice rejecting all bids, proposals, or replies.” Id.

, Florida’s constitution requires the Legislature to “state with specificity the public necessity" thát justifies any enacted exemption. Art. I, § 24(c), Fla. Const. Carlson has not challenged the Legislature’s constitutional au-thorlty to enact this exemption,

. In another provision, though, the Legislature has referred to an "exémpt portion of an exempt meeting,” §' 1004.055(2), Fla. Stat., suggesting that the Legislature’s use of “exempt meeting” does not always refer to a meeting that is entirely exempt.

. Incidentally; section 286.0113(2)(b)(l), as originally enacted (then numbered *1268 286.0113(2)(a)) exempted: "A meeting at which a negotiation with a vendor is conducted ....” Ch. 2006-284, § 2, Laws of Fla. In 2011, the Legislature added the words "Any portion of” at the same time it established the negotiation-strategies exemption with the same language. Ch. 2011-140, § 2, Laws of Fla. The Legislature’s specific addition of "any portion of” where it did not previously exist further shows we should accord those words meaning.